RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 23a0044p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

STEVEN LEE MOSS,

                *Petitioner-Appellee*,

    *v.*

GARY MINIARD, Warden,

                *Respondent-Appellant.*

No. 21-1655

─────────────────

Appeal from the United States District Court for the Eastern District of Michigan at Flint.
No. 4:18-cv-11697—Linda V. Parker, District Judge.

Argued:  October 20, 2022

Decided and Filed:  March 17, 2023

Before:  COLE, GIBBONS, and BUSH, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:**  Scott R. Shimkus, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellant.  Esthena Barlow, GEORGETOWN UNIVERSITY, Washington, D.C., for Appellee.  **ON BRIEF:**  Scott R. Shimkus, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellant. Hannah Mullen, Brian Wolfman, Madeline Meth, Radiance Campbell, Caleb Thompson, Lois Zhang, GEORGETOWN UNIVERSITY, Washington, D.C., for Appellee.

     GIBBONS, J., delivered the opinion of the court in which BUSH, J., joined.  COLE, J. (pp. 17–37), delivered a separate dissenting opinion.

---

**OPINION**

---

JULIA SMITH GIBBONS, Circuit Judge.  The Warden appeals the district court's grant of petitioner Steven Moss's habeas petition based on ineffective assistance of counsel analyzed under *United States v. Cronic*, 466 U.S. 648 (1984).  The Warden argues that the district court erred in three ways: (1) finding that Moss's untimely petition was entitled to equitable tolling; (2) excusing the procedural default of Moss's ineffective assistance of trial counsel claim based on the ineffective assistance of appellate counsel; and (3) granting Moss habeas relief on his claims, rather than deferring to the state court's adjudication of the issues under *Strickland v. Washington*, 466 U.S. 668 (1984).

Because the state court's denial of Moss's ineffective assistance claims under *Strickland* was not contrary to nor an unreasonable application of clearly established federal law, we defer to its decision that Moss is not entitled to habeas relief.  We therefore hold that the district court erred in granting Moss relief and reverse and remand with instructions to deny the petition with prejudice.

**I.**

This case arises from an encounter between Steven Moss and "Diego," a paid informant for the Drug Enforcement Agency ("DEA").[1]  On November 6, 2012, Moss first met Diego and agreed to purchase ten kilograms of cocaine from him.  *People v. Moss*, No. 319954, 2015 WL 3604582, at *1.  Two days later, Moss and Diego agreed to meet to complete the deal.  *Id*.  Thus, on November 9, Moss (accompanied by another man) and Diego (accompanied by an undercover officer driving the van containing the cocaine) met in the parking lot of a Home Depot store.  *Id*.  After Moss showed the purchase money to Diego, "the men walked to the undercover van where [Moss] was again shown the [drugs]."  *Id*.  Moss then "took possession of the van keys, got in

---

[1]We primarily rely on the facts in the Oakland County Circuit Court opinion denying Moss's appeal as of right as well as the transcripts from Moss's entrapment hearing and bench trial.  *People v. Moss*, No. 319954, 2015 WL 3604582, at *1 (Mich. Ct. App. June 9, 2015).  Under AEDPA, the state court's factual findings are entitled to a presumption of correctness.  28 U.S.C. § 2254(e)(1); *see also Phillips v. White*, 851 F.3d 567, 571 (6th Cir. 2017).

the driver's seat, and turned on the ignition before the police remotely disabled the van." *Id.* Moss was arrested and charged with possession with intent to deliver 1,000 or more grams of cocaine and possession of a firearm during the commission of a felony in violation of Michigan law. *Id.*

Moss's first attorney moved to conduct an entrapment hearing. On September 6, 2013, David Steingold began representing Moss.

When the entrapment hearing began ten days later, Steingold attested to minimal pre-trial preparation. Steingold complained to the court about his difficulty obtaining discovery before the hearing and stated that he was unable to consult with Moss's previous counsel or interview or solicit any witnesses. Steingold's pre-hearing actions consisted of meeting with Moss for two hours before the hearing, reviewing Moss's protected record, and persuading him to proceed with a bench trial on the day of the hearing.

Moss was the only witness presented by defense counsel. In his direct examination, conducted by Steingold's stand-in counsel, Lisa Dwyer, Moss testified that he was introduced to Diego through a friend, Bennett. Moss explained that Bennett threatened Moss to induce him to loan Bennett money for selling drugs. The plan was that, using Diego as a middleman, Bennett would sell the drugs, in return for which Moss would receive his original sum plus profit. When Moss met Diego at Home Depot to give him the money to complete the transaction, Diego asked Moss to drive his van across the parking lot to Moss's car, where Diego would collect the money. Moss testified that, after he entered the van and tried to start the ignition, Diego and the van's driver left the scene, and Moss was arrested after he jumped out of the van. The prosecution cross-examined Moss, using video footage and audio recordings of Moss's meetings and conversations with Diego to challenge his testimony. Steingold conducted Moss's redirect.

Steingold then requested a continuance to contact four witnesses. He explained that he only learned about three of the four during Moss's direct and cross-examination. The court permitted Steingold to contact one witness but denied a continuance, noting that Steingold could have accessed the other three before trial because Moss's previous counsel made a record of their

names. Ultimately, Steingold declined to call the witness and acknowledged that he had no others to call without a continuance.

The prosecution presented five witnesses and multiple exhibits. The first witness, Anthony Rodriguez, testified that Moss had invested in Rodriguez's business but then threatened Rodriguez to convince him to buy cocaine with the money Moss gave him, after which Rodriguez reported to a federal agent that Moss had money to buy drugs. Steingold cross-examined Rodriguez. The testimony of the next four witnesses—all DEA agents—detailed that Moss knew about the cocaine located in the van before taking the keys and that the informant Diego was instructed not to pressure Moss into completing the transaction. Steingold cross-examined three of the four agents and objected to portions of their direct testimony.

In closing, Steingold argued that Bennett and Diego entrapped Moss into completing the transaction. The prosecution responded that Moss did not establish entrapment because, even taking Moss's testimony as true, he only demonstrated that he was presented with an opportunity to make money that he wanted or needed—not that Diego, the government informant, forced him to make the deal.

The court denied Moss's motion to dismiss the charges against him based on entrapment. According to the court, even if it believed Moss's testimony, "nothing . . . would make [it] conclude that [Moss] was entrapped" because "[t]here was nothing to show that Diego forced [Moss] to participate." DE 5-5, Tr., Page ID 654-55. After denial of the motion and upon Steingold's admission that he "was not prepared to go to trial," the court granted Steingold a sixteen-day continuance to prepare for trial. *Id*. at Page ID 657.

During the bench trial, Steingold waived his opening argument and presented no witnesses. He stipulated to the admission of the transcript from the entrapment hearing as substantive evidence. For one of the government's two witnesses, DEA Detective Douglas Stewart, Steingold did not object during his testimony or conduct any cross-examination. Although Steingold cross-examined DEA Special Agent John Hill, Steingold also conceded that Hill's testimony at the entrapment hearing had been admitted as part of the stipulated transcript. Steingold waived his closing argument.

The next day of trial, Steingold failed to appear. Dwyer, appearing in Steingold's place, introduced herself and requested to reduce Moss's bond, which was denied. The court found Moss guilty. Moss was sentenced to consecutive sentences of fifteen to forty-five years in prison on the possession count and two years on the felony firearm count.

### 1. State Court Direct Appeal

Proceeding with Suzanna Kostovski as his appellate counsel, Moss moved to remand his case for a *Ginther*[2] hearing based on ineffective assistance of trial counsel. Kostovski argued that Steingold provided constitutionally ineffective assistance to Moss under *Strickland* by waiving Moss's right to a jury trial and stipulating to the admission of the evidence from the entrapment hearing for use in the bench trial. The Michigan Court of Appeals granted Kostovski's motion to remand, but the trial court ultimately denied Moss's motion for a new trial because Kostovski did not establish that Steingold's performance was constitutionally ineffective under *Strickland*.

On June 9, 2015, the Michigan Court of Appeals affirmed Moss's conviction and sentence. The Michigan Supreme Court denied him leave to appeal that decision on December 22, 2015. Moss did not file a petition for a writ of certiorari at the United States Supreme Court.

### 2. State Collateral Appeal

Nearly two years later, represented by different counsel, Moss filed a state collateral motion for relief from judgment in a Michigan trial court. He requested a new trial and argued that, under *Cronic*, Steingold had constructively abandoned Moss both in the pre-trial proceedings and during trial. The Michigan trial court denied the motion. It held that Moss failed to show that his claim for ineffective assistance of counsel was governed by *Cronic* because, given "the overwhelming evidence against [Moss]," trial counsel's strategy to use a stipulated-fact bench trial to expedite an appeal of the court's denial of the motion to dismiss on entrapment grounds did not "fail[] to subject the prosecutor's case to meaningful adversarial testing[.]" DE 5-11, Op. & Order, Page ID 914. Reviewing his ineffective assistance claim

---

[2]In Michigan, a *Ginther* hearing is an evidentiary hearing regarding an ineffective assistance of counsel claim. *See People v. Ginther*, 390 Mich. 436 (1973).

instead under *Strickland*, the court concluded that Moss failed to satisfy both the cause and prejudice prongs of the test.

Moss applied but was denied leave to appeal to the Michigan Court of Appeals and was denied leave to appeal to the Michigan Supreme Court.

### 3.  Federal Habeas Proceedings

While his state collateral proceedings were still pending, Moss filed a federal habeas petition in the Eastern District of Michigan.  The petition raised two claims under *Cronic*: that Steingold abandoned Moss (1) before trial by failing to conduct pre-trial interviews and (2) at trial by failing to subject the prosecution's case to meaningful adversarial testing.  Moss argued that his appellate counsel was ineffective for failing to raise these claims on direct appeal, which would excuse their procedural default.

The government moved to dismiss the petition on the grounds that it was barred by the one-year limitations period ending on March 21, 2017.  Moss disagreed, contending that the last day of the limitations period was March 22, 2017, the day on which he moved for collateral relief and tolled his deadline to file a habeas petition.

The district court concluded that Moss's petition was untimely but that he was entitled to equitable tolling because he diligently pursued the litigation and understandably relied on confusing case law.  However, the district court denied Moss's petition for habeas relief because it determined that the state court's decision was not contrary to nor an unreasonable application of *Strickland.*  Moss moved for reconsideration, arguing that the district court erred by (1) misidentifying *Strickland*'s ineffective-assistance framework as the correct legal standard instead of *Cronic*'s constructive-denial-of-counsel framework, and (2) misapplying *Cronic* and ignoring binding precedent.

On reconsideration, the district court agreed with Moss.[3]  It excused Moss's procedural default of his *Cronic* claims because it found that Kostovski was constitutionally ineffective in

---

[3]The district court concluded that Moss was entitled to habeas relief on his first and third claims, so it declined to reconsider its decision that he was not entitled to habeas relief on his second claim.  The Warden only appealed the district court's order on reconsideration.  Thus, the district court's earlier denial of relief on the second

failing to raise them on direct appeal.  Next, the district court reviewed the merits of Moss's *Cronic* claims and found that Steingold constructively abandoned him.  Holding that the "state court unreasonably applied the *Strickland* standard where Petitioner clearly was constructively denied the assistance of trial counsel [under *Cronic*]," the district court granted Moss habeas relief based on his *Cronic* claims.  DE 33, Mem. Op. & Order, Page ID 1845.  This appeal followed.

## II.

We review de novo the district court's legal conclusions in a habeas corpus proceeding. *DeLisle v. Rivers*, 161 F.3d 370, 380 (6th Cir. 1998) (en banc).  "Factual determinations are generally reviewed for clear error, except where the district court has made factual determinations based on its review of trial transcripts and other court records.  In such cases, because no credibility determination or findings of fact are required, factual conclusions are reviewed de novo." *Dando v. Yukins*, 461 F.3d 791, 796 (6th Cir. 2006) (internal quotation and citations omitted).  Further, whether a claim is barred by a statute of limitations is a question of law subject to de novo review.  *Sierra Club v. Slater*, 120 F.3d 623, 630 (6th Cir. 1997).

By contrast, we apply a deferential review to state court habeas determinations under the standard set out by the Antiterrorism and Effective Death Penalty Act ("AEDPA").  *Id.*; 28 U.S.C. § 2254(d).  Under AEDPA, federal courts may grant habeas relief to a petitioner in state custody only if the state court adjudicated the claim(s) on the merits and either:

> (1) the state court's decision was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court . . . or (2) the state court's decision was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

28 U.S.C. § 2254(b), (d)(1)–(2); *see Dando*, 461 F.3d at 796.

---

claim—that Moss was "deprived of his Sixth Amendment right to counsel of choice . . . when he was represented by nonretained Attorney Dwyer without authorization[]"—is not at issue here. *See* DE 18, Op. & Order, Page ID 1677.

**III.**

On appeal, the Warden argues that Moss's habeas petition is barred by AEDPA's statute of limitations and is not entitled to equitable tolling; that Moss's procedurally defaulted ineffective assistance claims are not excused by ineffective assistance of appellate counsel; and that Moss is not entitled to habeas relief on the merits of his claims. We begin with timeliness.

**1. Statute of Limitations**

AEDPA created a one-year statute of limitations for federal habeas petitions. *See* 28 U.S.C. § 2244(d)(1). The statute of limitations begins to run from the latest of four circumstances; the relevant one in this case is the "date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." *Id.* § 2244(d)(1)(A). This limitations period can be tolled for the amount of time in which "a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending." *Id.* § 2244(d)(2).

The parties agree that Moss's conviction became final on March 21, 2016, when his opportunity to petition the Supreme Court expired. CA6 R. 29, Corr. Appellee Br., at 15; *see* 28 U.S.C. § 2244(d)(1)(A). That day is considered the "day of finality." The Warden argues that Moss's motion was filed the day after AEDPA's one-year limitations period expired, barring his later-filed petition, but Moss maintains that he moved for collateral relief on the last day of the AEDPA limitations period and tolled his deadline to petition for habeas relief. In the alternative, Moss argues that, even if his motion for collateral relief was filed after the limitations period ended, the district court did not err in holding that equitable tolling should apply.

Whether Moss's habeas petition can be tolled by his motion for collateral relief depends on the duration of the § 2244(d) statute of limitations period. To determine the start of a limitations period, we apply "Federal Rule of Civil Procedure 6(a)'s standards for computing periods of time to § 2244(d)'s one-year statute of limitations." *Bronaugh v. Ohio*, 235 F.3d 280, 284 (6th Cir. 2000) (internal citations omitted). Rule 6(a) provides that one must "exclude the day of the event that triggers the period" and "include the last day of the period[.]" Fed. R. Civ. P. 6(a)(1)(A), (C). The rule instructs that, "in computing the applicable period, the day of the

relevant event is the zero point from which days are to be counted." *Merriweather v. City of Memphis*, 107 F.3d 396, 399 (6th Cir. 1997) (emphasis omitted). Thus, our precedent and Federal Rule 6(a) confirm that, although the AEDPA limitations period is triggered on the day of finality, the clock begins to run the following day.

*Bronaugh* illustrates this principle in practice. The last day on which the *Bronaugh* petitioner could have filed a petition for a writ of certiorari was September 9, 1996. The court considered the language of AEDPA and Rule 6(a) before finding that the day of finality was September 9, 1996, and, pursuant to Rule 6(a), "Bronaugh's one-year statute of limitations began to run on September 10, 1996." *Id.* at 285. Thus, the triggering day of finality was excluded in this computation.

*Bronaugh* also informs how we define the limitations deadline. There, we calculated the deadline for the petitioner to file his habeas petition as September 9, 2017—the anniversary of the date of finality. 235 F.3d at 285. Expressed in days, the limitations period thus ran *from and including* September 10, 2016 ("day one," the day following the day of finality) *to and including* September 9, 2017 (day 365). Expressed in years, the limitations period would therefore end on the anniversary of the finality date. Using the anniversary method of Rule 6(a) to compute the limitations period "has the advantage of being easier for petitioners, their attorneys and the courts to remember and apply." *Patterson v. Stewart*, 251 F.3d 1243, 1246 (9th Cir. 2001).

Here, Moss's one-year statute of limitations was triggered on March 21, 2016, the day of finality, and began to run on March 22, 2016, the following day. So the limitations period ended on March 21, 2017, the anniversary of the day of finality.[4] Because Moss moved for collateral

---

[4]As Moss indicates, this Circuit has made computation errors in unpublished decisions. *See*, *e.g.*, *Williams v. Wilson*, 149 F. App'x 342, 345 (6th Cir. 2005) (incorrectly extending limitations period by one day); *Liggins v. Vashaw*, No. 20-1037, 2020 WL 3866872, at *1 (6th Cir. Apr. 29, 2020), *cert. denied*, 141 S. Ct. 1274 (2021), *reh'g denied*, 141 S. Ct. 2750 (2021) (same); *Carlyle v. Campbell*, No. 18-1631, 2018 WL 11301139, at *1 (6th Cir. Sept. 26, 2018) (same); *Kirchoff v. Warden, Chillicothe Corr. Inst.,* No. 16-4186, 2017 WL 4863119, at *2 (6th Cir. May 25, 2017) (same). But "an unpublished decision of this Court . . . is not binding authority." *In re Blasingame*, 986 F.3d 633, 637 n.2 (6th Cir. 2021). Further, the one-day miscalculation was harmless and not dispositive in these cases, as each petitioner had longer filing delays. *See Wilson*, 149 F. App'x at 346 (petition months late); *Liggins*, 2020 WL 3866872, at *1 (petition almost two decades late); *Carlyle*, 2018 WL 11301139, at *1 (petition over five years late); *Kirchoff,* 2017 WL 4863119, at *2 (petition months late).

relief on March 22, 2017, his habeas limitations period had already expired. Moss's petition, ultimately filed in May 2018, was therefore untimely.

### 2. Equitable Tolling

AEDPA's limitations period "is subject to equitable tolling in appropriate cases." *Holland v. Fla.*, 560 U.S. 631, 645 (2010). We grant equitable tolling "sparingly." *Robertson v. Simpson*, 624 F.3d 781, 784 (6th Cir. 2010). Here, however, because the statute of limitations does not present a jurisdictional bar to habeas review, and because we hold that Moss is not entitled to habeas relief for the reasons discussed below, we decline to determine on appeal whether the district court properly tolled Moss's petition. *See Smith v. Ohio Dep't of Rehab. and Corr.*, 463 F.3d 426, 429, n.2 (6th Cir. 2006) (declining to address statute-of-limitations defense on appeal in part because AEDPA's statute of limitations is not jurisdictional); *see also Trussell v. Bowersox*, 447 F.3d 588, 590 (8th Cir. 2006) (holding that, despite probable untimeliness, "because neither the statute of limitations nor procedural default constitutes a jurisdictional bar to our review," the court would, "in the interest of judicial economy, proceed to the merits of [the] petition"). We instead proceed to the merits and the question of procedural default.

### 3. Procedural Default

The Warden argues that the district court erred by excusing Moss's procedural default of his ineffective assistance of trial counsel ("IATC") claim because Moss's appellate counsel was not ineffective on direct appeal. However, Moss maintains that his appellate counsel's failure to raise his meritorious IATC claims under *Cronic* excuses his procedural default.[5]

Because Moss's IATC claims are procedurally defaulted, we may only consider them if Moss shows cause for failing to raise them on direct appeal and demonstrates that he would be prejudiced if they are not considered. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). "Ineffective assistance of counsel can supply the cause that, together with prejudice, would excuse a procedural default." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (quoting

---

[5]Both parties agree that Moss procedurally defaulted his IATC claims under *Cronic* by failing to raise them on direct appeal, as required by Michigan Court Rule 6.508(D)(3). And Moss could not procedurally default his ineffective assistance of appellate counsel claim because his first opportunity to raise that claim was on post-conviction review. *See Guilmette v. Howes*, 624 F.3d 286, 291 (6th Cir. 2010).

*Murray v. Carrier*, 477 U.S. 478, 488 (1986)). The state court concluded that Moss's underlying IATC claims were not meritorious under *Strickland* and that he therefore did not establish the requisite cause and prejudice to excuse his procedural default. We now evaluate whether the state court's adjudication of Moss's IATC claims warrants AEDPA deference.

For AEDPA's deferential standard to apply, the state-court adjudication must have been "on the merits." 28 U.S.C. § 2254(d). A judgment is typically considered to be "on the merits" if it is "delivered after the court . . . heard and evaluated the evidence and the parties' substantive arguments." *Johnson v. Williams*, 568 U.S. 289, 302 (2013) (quoting Black's Law Dictionary 1199 (9th ed. 2009)). To determine whether the state courts decided an issue on the merits, we review the opinion of "the last state court to issue a reasoned opinion on the issue." *Hoffner v. Bradshaw*, 622 F.3d 487, 505 (6th Cir. 2010) (quoting *Payne v. Bell*, 418 F.3d 644, 660 (6th Cir. 2005)). Accordingly, we follow the district court in reviewing the Oakland County Circuit Court opinion denying the motion for relief from judgment as the last state court to issue a reasoned opinion. Because the post-conviction court acknowledged and engaged with both the *Strickland* and *Cronic* tests for ineffective assistance of trial counsel, AEDPA's deferential standard of review applies.

A state court's decision is "contrary to" clearly established federal law if the state court "applies a rule that contradicts the governing law" as determined by Supreme Court precedent or "the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from" the Supreme Court's precedent. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000); *see also White v. Woodall*, 572 U.S. 415, 419 (2014). A state court's decision is an "unreasonable application" of federal law if "there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). Moss argues that the state court's application of *Strickland* was contrary to and an unreasonable application of the clearly established law of *Cronic*. The Warden responds that the state court properly applied the governing law of *Strickland* when rejecting Moss's claims. As discussed below, we agree with the state court that *Strickland* governs Moss's claims.

Ineffective assistance claims may be reviewed under *Strickland* or under *Cronic*. *See Bell v. Cone,* 535 U.S. 685 (2002). While claims reviewed under *Strickland* demand a showing of both deficient performance and prejudice, *Cronic* claims arise when a defendant establishes a level of performance by trial counsel that is "so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." *Id.* at 695 (citing *Cronic*, 466 U.S. at 658). In other words, prejudice may be presumed when a trial counsel's performance is so grossly deficient that it amounts to an effective denial of counsel. *Id. Cronic*'s presumption-of-prejudice analysis is warranted in two scenarios: (1) when the defendant "is denied the presence of counsel at 'a critical stage'" and suffers "the complete denial of counsel," and (2) when "'counsel entirely fails to subject the prosecution's case to meaningful adversarial testing.'" *Id.* at 695-96 (quoting *Cronic*, 466 U.S. at 659).

Moss argues that his claims warrant review under *Cronic* under both scenarios because Steingold constructively abandoned him during pre-trial proceedings and failed to meaningfully test the prosecution's case at trial. However, the complete-denial scenario does not apply to Moss's claims because there is no evidence that Moss's counsel was physically absent throughout an entire phase of the litigation or that a state actor prevented Moss's counsel from adequately representing him. *See Maslonka v. Hoffner*, 900 F.3d 269, 280 (6th Cir. 2018) ("We therefore decline to extend the *Cronic* complete-denial exception to cases where a counsel is physically absent due to the counsel's own failure to be present, without any denial by the state."); *see also Mitchell v. Mason*, 325 F.3d 732 (6th Cir. 2003) (finding that, "[w]hen counsel is appointed but never consults with his client *and* is suspended from practicing law for the month preceding trial, *and* the court acquiesces in the constructive denial of counsel by ignoring the defendant's repeated requests for assistance, *Cronic* governs.") (emphasis added).

As for the second scenario, Moss's argument still fails because Steingold did not entirely fail to subject the prosecution's case to meaningful adversarial testing. *See Bell*, 535 U.S. at 697. Steingold prepared for the entrapment hearing by consulting with Moss for two hours before it began and by reviewing Moss's "private restricted record." DE 5-2, Tr., Page ID 104. That consultation distinguishes Moss's representation from that rendered by defense counsel in *Mitchell*, where defense counsel spent only six minutes consulting with his client pre-trial and

failed to conduct any pre-trial investigation. 325 F.3d at 748. Steingold also objected to and cross-examined the government's witnesses during the entrapment hearing, and requested a continuance to subpoena needed witnesses—a request the court denied—although he ultimately declined to call other witnesses. Further, although Moss's retained counsel, Steingold, did not conduct the entire entrapment hearing, Moss was still represented by Lisa Dwyer in those instances without Moss's objection. *See, e.g., United States v. Dykes*, 460 F. 2d 324, 325 (9th Cir. 1972) (defendant was not deprived of effective representation of counsel because substitute defense attorney was present during jury instructions and defendant did not object to substitute attorney's presence and participation).[6] Ultimately, an "attorney's failure must be complete" rather than failing to act "at specific points," so it cannot be said that Steingold and Dwyer failed to meaningfully challenge the prosecution's case through their actions. *Bell*, 535 U.S. at 697.

But Moss still argues that the prosecution's case was not meaningfully tested at *trial* because Steingold "waived his opening and closing arguments, failed to subpoena, interview, or produce any witnesses, and did not cross-examine or raise objections to one of the government's two witnesses." CA6 R. 29, Corr. Appellee Br., at 38. The Warden responds that Steingold only acted in a limited capacity during trial because the trial court had already denied the motion to dismiss based on entrapment, and Steingold strategically focused on its appeal to the Michigan appellate courts—Moss's only available recourse at that time.

We agree with the Warden. An artificial distinction between Steingold's pre-trial and trial actions overlooks his strategic focus on an entrapment defense. After the court denied the entrapment motion, Steingold chose to focus on the appeal of its denial rather than conduct a protracted trial. The stipulated nature of the bench trial and the lack of further investigation, examination, or cross-examination of witnesses would not have happened but for this strategy crafted in the earlier stages of the litigation. *See Strickland*, 466 U.S. at 691 ("counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations *unnecessary*") (emphasis added). Steingold's focus on this defense confirms his

---

[6]As noted *supra* at p.9 n.3, any choice-of-counsel challenge to Ms. Dwyer's representation of Moss during this litigation is not at issue in this appeal.

strategic perspective of the limited value of trial, but it does not demonstrate that he never meaningfully challenged the prosecution's case.

Moss advances one last reason that *Cronic* should govern: even if Steingold's trial behavior was a strategic choice, his inaction at trial was "inexcusable" because Moss had an "almost certainly" viable defense left. CA6 R. 29, Corr. Appellee Br., at 40. Moss argues that he could have testified at trial to challenge his intent to possess the cocaine or his knowledge of it, leaving his testimony subject to a credibility assessment, or that Steingold could have argued for the application of a lesser offense. In support, Moss points to *Martin v. Rose*, 744 F.2d 1245 (6th Cir. 1984), a case in which trial counsel refused to participate during the trial based on his belief that his participation would render his pretrial motions, the denial of which he hoped to appeal, harmless error. 744 F.2d at 1249. Yet Martin's counsel was aware that the only direct evidence against Martin was the testimony of his stepdaughters. The court assessed that Martin was willing to testify before the jury—entitled to make its own credibility determination—that the girls were encouraged to falsify the incident. *Id*. at 1250. Thus, the court held that the counsel's "strategic reasoning, while superficially persuasive," was an "unreasonable tactic since the attorney was aware of a strong defense that he could present without compromising his earlier motions." *Id.*

Unlike *Martin*, Steingold's approach at trial did not deprive Moss of the opportunity to present a defense because no defense was viable or available to him. Unlike the sole direct evidence confronting the defendant in *Martin*, stipulated evidence at Moss's trial included video and audio recordings of his meetings and telephone conversations with Diego, the informant; his own testimony delivered at the entrapment hearing; and witness testimony of the transaction that occurred in the Home Depot parking lot. *People v. Moss*, No. 319954, 2015 WL 3604582, at *1 (Mich. Ct. App. June 9, 2015). Further, the credibility of Moss's testimony at trial would not have been assessed by a jury, like in *Martin,* because Moss had a bench trial. So the same judge who heard Moss's testimony at the entrapment hearing and still denied the motion would assess his credibility again at trial. Additionally, Moss has not established that he wanted to testify but Steingold prevented him from doing so, nor has he provided evidence showing that Steingold could have argued for a lesser offense.

*Strickland*, not *Cronic*, governs Moss's ineffective assistance claims. The state court's application of this clearly established governing law to deny Moss's claims was reasonable and subject to fair-minded disagreement, so AEDPA deference applies. And in this case, the state court's conclusion that Moss failed to establish the prejudice prong of *Strickland* on his IATC claim is dispositive. *See Dekeyzer v. Harry*, 603 F. App'x 399, 404 (6th Cir. 2015) ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed.") (quoting *Strickland*, 466 U.S. at 670). Moss does not argue nor establish that Steingold's behavior prejudiced the outcome of Moss's case. *See Williams v. Burt*, 949 F.3d 966, 975 (6th Cir. 2020) (citing *Strickland*, 466 U.S. at 687) (noting the requirement of a "cause-and-effect relationship between the deficient performance and any prejudice suffered by the defendant."). Fairminded jurists would therefore not disagree that Moss failed to establish ineffective assistance of trial counsel under *Strickland.*

Without a meritorious ineffective assistance of trial counsel claim, the state court reasonably concluded that Moss failed to show cause excusing his procedural default. *See, e.g., Boyd v. Yukins*, 99 F. App'x 699, 705 (6th Cir. 2004) (failure of appellate counsel to raise unmeritorious ineffective assistance of trial claim cannot excuse procedural default); *see also Shaneberger v. Jones*, 615 F.3d 448, 452 (6th Cir. 2010) ("[A]ppellate counsel cannot be found to be ineffective for 'failure to raise an issue that lacks merit.'") (quoting *Greer v. Mitchell*, 264 F.3d 663, 676 (6th Cir. 2001)). There is not a reasonable probability that including an unmeritorious *Cronic* claim would have changed the result of Moss's appeal. *See Hale v. Burt*, 645 F. App'x 409, 415 n.1 (6th Cir. 2016) ("A counsel's 'failure to raise an issue on appeal' does not amount to ineffective assistance unless 'there is a reasonable probability that inclusion of the issue would have changed the result of the appeal.'" (citing *McFarland,* 356 F.3d at 699)). That decision was not contrary to nor an unreasonable application of *Strickland*.

Because the state court's denial of Moss's ineffective assistance claims under *Strickland* was not contrary to nor an unreasonable application of clearly established federal law, we defer to its decision that Moss is not entitled to habeas relief. The district court erred in concluding otherwise.

**IV.**

For the foregoing reasons, we reverse and remand with instructions to deny the petition with prejudice.

————————————

**DISSENT**

————————————

COLE, Circuit Judge, dissenting.  Steven Moss was sentenced to 15–45 years in prison after an entrapment hearing for which his attorney, David Steingold, arrived entirely unprepared, and a bench trial that lasted only 20 minutes.  At every step along the way, from his failure to investigate and interview witnesses to his failure to meaningfully test the prosecution's case, Steingold failed to conduct himself in the manner consistent with effective representation.  Because Moss was constructively denied the assistance of counsel in the critical pre-trial and trial phases of his criminal proceedings, I would grant Moss's habeas petition.  For that reason, I respectfully dissent.

## I.  BACKGROUND

**A.  State Proceedings**

*1. Initial Proceedings*

Moss was convicted of possession with intent to deliver 10 or more kilograms of cocaine and possession of a firearm during the commission of a felony.  *People v. Moss*, No. 319954, 2015 WL 3604582, at *1 (Mich. Ct. App. June 9, 2015) (per curiam); Mich. Comp. Laws §§ 333.7401(2)(a)(i) (drug charge), 750.227b (firearm charge).  He was arrested after purchasing 10 kilograms of cocaine from a Drug Enforcement Agency ("DEA") informant, known as "Diego."  *Moss*, 2015 WL 3604582 at *1–3.

Moss's first attorney, Paul Curtis, who was disbarred during the pendency of Moss's proceedings, filed a "Motion to Conduct an Entrapment Hearing."  (Pet., R. 1, PageID 5.)  The entrapment defense rested on the premise that Moss's friend Michael Bennett introduced Moss to Diego and pressured Moss into giving Diego money for drug trafficking.  *Moss*, 2015 WL 3604582, at *2.  Ten days before the entrapment hearing, Steingold began representing Moss.  As of the commencement of his representation, Steingold knew that an entrapment hearing was scheduled and that the trial date had been set.

Steingold's deficient representation of Moss started the moment he entered the courtroom. He began by admitting that he was not prepared to conduct the entrapment hearing because "[t]here is a lack of investigation that was done." (Evidentiary Hr'g Tr., R. 5-2, PageID 103.) He asked the court for an additional adjournment because there were "a number of questions that remain[ed] unanswered" after he met with Moss immediately preceding the hearing, and that the one known witness was not present. (*Id.* at PageID 103–04.) Having previously granted Steingold more time, the court denied the request. When Steingold insisted that his lack of preparation was a result of difficulty accessing discovery due to a protection order, and that he "didn't know what [he was] walking into," the court responded that he "shouldn't have taken the case." (*Id.* at PageID 105–06.)

So, despite believing entrapment was Moss's best and only defense, Steingold's hearing preparation consisted solely of one conversation with Moss immediately prior to the start of the hearing during which time he convinced Moss to waive his right to a jury trial and proceed with a bench trial instead. In the ten days before the hearing, Steingold did not speak with Moss until they were both at the courthouse before the hearing, did not conduct any investigation, did not interview any witnesses, did not speak with Moss's previous attorneys, and did not conduct pertinent legal research. All of this substantiates Steingold's own admission that he was not prepared for the hearing.

The hearing nonetheless proceeded. Moss first testified on direct and cross-examination. After Moss's testimony concluded the next day, the judge asked if Steingold had additional witnesses. Steingold again asked for a continuance because there were four other witnesses he could call from "those people referred to in . . . my client's direct and cross-examination," but that he needed to subpoena them to attend the hearing. (Evidentiary Hr'g Tr., R. 5-3, PageID 340.) The judge was incredulous: "[W]hat do you mean subpoena them? If you were intending to call them as witnesses, why didn't you subpoena them already?" (*Id.*) Further interrogating Steingold's preparation, the judge reminded Steingold that he had only mentioned one individual the day before, whereas he now mentioned three additional individuals. In response to the judge's inquiry as to "when . . . [he] discover[ed] all of these witnesses[,]" Steingold responded,

"Yesterday during the testimony, your Honor." (*Id.* at PageID 342, 346.) To be precise, Steingold discovered the witnesses during the government's cross-examination of Moss.

Recognizing that Steingold had not prepared for the hearing, nor had he apparently discussed Moss's anticipated testimony in any detail before Moss took the stand, the judge questioned Steingold regarding a potential attempt "to put an ineffective assistance of counsel with respect to [his] conduct of this on the Record also for appellate purposes[.]" (*Id.* at PageID 342.) Explaining her disbelief, she continued: "Those names were brought up to this court with his first attorney[.] With respect to the fact that they were witnesses to conversations between the defendant and Mr. Bennett. That, I remember, specifically from back then. So, evidently those names were known from the inception." (*Id.* at PageID 348.) Speaking directly to Steingold, she finished, "And now, here we are, they're news to you. How is that possible, I guess, is my first question?" (*Id.*) The judge made clear that Moss's first attorney "didn't get those names out of a hat," and instead "must have gotten them from [Moss]," to which Steingold's only response was that he had not spoken with Moss enough to obtain that information. (*Id.* at PageID 348–49.) Beyond Steingold's complete failure to investigate the case and call witnesses whose names would have been known from even a cursory investigation, he also failed to subpoena the one witness he did know about prior to the hearing. And after asking the court for a continuance twice specifically to have that witness testify, Steingold told the court that he "determined not to call him," without further explanation. (*Id.* at PageID 351.) By contrast, the government called five witnesses during the hearing.

The trial judge denied Moss's motion to dismiss on November 1, finding that Moss had not been entrapped. After the ruling, Steingold eventually moved to reinstate the jury trial he had previously counseled Moss to waive. But when the court denied the request, Steingold instead went to the opposite extreme: agreeing to a stipulated bench trial that conceded Moss's guilt. When the court then indicated that trial would begin immediately, on November 1, Steingold responded that he "frankly was not prepared to go to trial today," even though he had been told on September 6 that trial was scheduled for September 17. (*Id.* at PageID 657.) The judge nevertheless continued trial again until November 18.

Despite the continuance, Steingold remained as unprepared for trial as he had been for the entrapment hearing. The trial took only 20 minutes. During those 20 minutes, Steingold constructively abandoned Moss. He waived both his opening statement and closing argument, and called no witnesses to the stand. He also stipulated to several incriminating facts, including that Moss had purchased 10 kilograms of cocaine, that such amount was inconsistent with personal drug use, as well as to many other facts and exhibits from the entrapment hearing, essentially conceding Moss's guilt. Moss's own version of the events was not mentioned, and he did not take the stand.

At trial, the government presented two witnesses. Steingold did not cross-examine the first witness, nor did he raise any objections during the government's direct examination. Steingold cross-examined the government's second witness, Agent John Hill. But Steingold questioned Hill only as to his experience and qualifications to serve as an expert witness, and ultimately argued that Hill's testimony was unnecessary because Steingold had already stipulated to the facts that Hill was called to prove. Thus, Steingold's sole action during the 20-minute trial was to concede the central point of guilt—that Moss had purchased the alleged quantity of cocaine with intent to sell it. Even though the government provided closing argument, Steingold did not, simply saying "I have nothing, your Honor." (*Id.* at PageID 694.)

The court found Moss guilty. Steingold did not appear at sentencing, and instead Lisa Dwyer—an attorney who at the time did not work at Steingold's firm, and whom Moss never hired but had been present at portions of the entrapment hearing—appeared in his place. Dwyer spoke only to request the court reduce Moss's bond, which the court denied. The court ultimately sentenced Moss to 15-45 years of imprisonment.

### 2. *State Direct Appeal*

Moss, acting pro se, appealed his conviction to the Michigan Court of Appeals, though he later hired Suzanna Kostovski as appellate counsel. The court granted his motion to remand so that he could file a motion for a new trial based on ineffective assistance of trial counsel ("IATC"). On remand, the trial court conducted a *Ginther* evidentiary hearing to document

Moss's ineffective assistance of counsel claim pursuant to *People v. Ginther*, 212 N.W.2d 922 (Mich. 1973).

Both Moss and Steingold testified at the *Ginther* hearing. In addition to indicating his awareness of the trial date, Steingold said that he moved for a stipulated fact bench trial to expedite the entrapment-defense appeal. He maintained that Moss had asked him, after the entrapment hearing, to seek a jury trial. Moss's appellate counsel, Kostavski, asked why Steingold had not filed an interlocutory appeal in light of Steingold's continued belief in Moss's innocence and knowledge that Moss would be convicted after the stipulated bench trial. Steingold blamed this on the fact that he was not paid his entire fee.

Moss then took the stand. He testified that when he first retained Steingold, he told Steingold about the hearing and trial dates, and thought that Steingold did not seem "concerned that . . . he didn't have enough time or it's such short notice," claiming that Steingold "was pretty much gung-ho with it at first." (*Ginther* Hr'g Tr., R. 5-9, PageID 810.) But that quickly changed. Even though Moss attempted to schedule meetings with Steingold in the short time between the start of the representation and the entrapment hearing, and then before the trial, they never met outside of the courthouse. As a result, Moss lacked information about, and was unprepared for, the entrapment hearing: He did not know that he would have to testify as to his actions and involvement in the underlying charges until the day of the hearing itself. Moss met with Steingold once "about 30 minutes before" the entrapment hearing began, at which point Steingold presented "a thick packet of maybe 40 or 50 pages that had questions that he wanted me [(Moss)] to answer . . . and he told me make sure you answer these right because we're going to be calling you onto the stand." (*Id.* at PageID 818.)

Moss also discussed how the jury waiver came about. Before the entrapment hearing, the trial judge indicated that she had a jury waiting, presumably because trial was set to start the next day. The court took a short recess, during which, according to Moss, "Steingold pulled [Moss] into the hall" and explained that "Judge Anderson is going to rush [them,]" so Steingold was "going to get a bench trial" to "buy [him] more time because [he was] not ready at th[at] time" for trial. (*Id.* at PageID 812.) When asked whether he understood the consequences of waiving a jury trial—including that the same judge from the entrapment hearing would conduct the bench

trial—Moss definitively responded, "No. [Steingold] was just saying that this would be the best course of action because, other than that, he wasn't prepared." (*Id.* at PageID 812–13.) Moss further testified that had he understood this point, he would not have waived a jury trial. But once Moss "found out" that "the judge [who] was going to hear [him] admit the things [he] admitted during the entrapment hearing" would "be the same judge who would decide [his] guilt or innocence," he wanted a jury trial. (*Id.* at PageID 819–20.)

Additionally, Moss disputed why Steingold asked the court to reinstate a jury trial, testifying that it was Steingold who suggested the change. Moss stated that, after the trial judge denied the entrapment defense, Steingold told him they "better have a jury trial[.]" (*Id.* at PageID 813.) As to the stipulations entered during the bench trial, Moss said that he never discussed the trial with Steingold and so did not know about or understand the stipulations. Moss also testified that his previous attorney had spoken with Moss's witnesses and that Moss explicitly told Steingold about the witnesses, though Steingold never spoke with them.

Last, Moss asserted that Steingold had spoken with another attorney, and that Steingold told Moss both attorneys agreed that "the best way to do it would be an interlocutory appeal." (*Id.* at PageID 816.) But Steingold indicated he would not pursue this course of action unless he received full payment for his services.

After the *Ginther* hearing, the trial court denied Moss's motion for a new trial. Moss appealed, and the Michigan Court of Appeals affirmed Moss's conviction and sentence. On December 22, 2015, the Michigan Supreme Court denied Moss leave to appeal his conviction. Moss did not petition for a writ of certiorari at the Supreme Court, and so his conviction became final on March 21, 2016, 90 days after the Michigan Supreme Court's denial of leave to appeal. *See* Sup. Ct. R. 13(1).

### 3. *State Collateral Review*

A year and a day later, on March 22, 2017, Moss filed a motion for relief from judgment in a state trial court, thereby pursuing state collateral relief. He argued that he was entitled to a new trial because Steingold had constructively abandoned him, and so provided ineffective assistance of counsel under *United States v. Cronic*, 466 U.S. 648 (1984). The court denied his

motion.  Moss sought, but was denied, leave to appeal to both the Michigan Court of Appeals and the Michigan Supreme Court.

**B.  Federal Proceedings**

In May 2018, while his state collateral appeal was pending, Moss filed a petition for a writ of habeas corpus in the Eastern District of Michigan.  Despite finding that Moss was entitled to equitable tolling for his otherwise untimely petition, the district court denied the habeas petition on the merits.  Moss filed a motion for reconsideration.  The district court partially reversed its decision, conditionally granting Moss's habeas petition on two grounds—IATC under *Cronic* during both the pre-trial and trial phases of his criminal proceedings.  Moss was released on bond on January 24, 2022.  Miniard, the warden at the prison where Moss was incarcerated, appeals the district court's grant of Moss's habeas petition.

## II.  ANALYSIS

Miniard appeals the district court's decision on three grounds:  (1) that the petition was untimely and is not entitled to equitable tolling; (2) that the claims were procedurally defaulted and cannot be excused; and (3) that both claims fail on the merits.  I take each in turn.

**A.  Timeliness**

AEDPA contains a one-year statute of limitations, which runs from the latest of four possible dates.  28 U.S.C. § 2244(d)(1).  AEDPA also has a tolling provision, such that "[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection."  *Id.* § 2244(d)(2); *see also Holbrook v. Curtin*, 833 F.3d 612, 615 (6th Cir. 2016).  The statute of limitations is subject to equitable tolling.  *Holland v. Florida*, 560 U.S. 631, 649 (2010).  Where, as here, the facts are not disputed, we review a district court's grant of equitable tolling to excuse the petition's untimeliness de novo.  *Robertson v. Simpson*, 624 F.3d 781, 784 (6th Cir. 2010).

I agree with the majority that Moss's federal habeas petition was untimely.  But we may nevertheless consider untimely petitions in certain circumstances, such as where the AEDPA

statute of limitations is subject to equitable tolling. *Holland*, 560 U.S. at 649. And as I diverge from the majority on the merits of Moss's petition, I necessarily diverge as to the importance of the tolling issue.

Equitable tolling applies if Moss can show "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." *Id.* (quotation marks omitted); *Hall v. Lebanon Corr. Inst.*, 662 F.3d 745, 749–50 (6th Cir. 2011). Equitable tolling is applied "sparingly." *Robertson*, 624 F.3d at 784.

Moss undeniably meets the first prong, as he has been "diligently" pursuing his rights on appeal. He has taken every appeal available to him, including all direct appeals by right, state post-conviction review, and federal post-conviction review. In all the filings involved in these various appeals, he has not missed a single additional deadline. And in the one instance he was untimely—his state collateral relief petition at issue for the tolling argument—he was only one day late. Miniard's sole argument to the contrary is that "Moss could have avoided the entire question of timeliness by being more diligent in the state courts, specifically by filing his motion for relief from judgment sooner." (Reply Br. 7.) The fact that "filing even one day sooner would have made the difference . . . exemplifies a lack of diligence." (*Id.*) But this argument fails to take into account that we apply equitable tolling only when the filing at issue *was* untimely. If Miniard's argument were meritorious, the equitable tolling doctrine would be rendered useless.

Finding that Moss meets the first of the two equitable tolling requirements, I move to consider whether an "extraordinary circumstance" excuses the untimely filing. Moss argues that this court's "confusing and contradictory legal landscape" regarding the statute of limitations calculations "created an extraordinary circumstance." (Appellee Br. 27.) Specifically, Moss highlights two points of confusion: (1) that this court sometimes ends the limitations period on the anniversary of the date of finality and at other times on the anniversary of the day after the date of finality, and (2) leap-year ambiguities in our caselaw.

Our caselaw regarding the statute of limitations computation is not a model of clarity. In *Bronaugh v. Ohio*, we stated that the limitations period ended on the anniversary of the date of

finality. 235 F.3d 280, 285 (6th Cir. 2000). But several of our panels have misapplied this statute of limitations standard, instead finding that the statute of limitations ends on the anniversary of the day after the date of finality, thereby extending the statute of limitations by a single day—precisely the amount of time at issue here. *See, e.g.*, *Liggins v. Vashaw*, No. 20-1037, 2020 WL 3866872, at *1 (6th Cir. Apr. 29, 2020), *cert denied*, 141 S. Ct. 1274 (2021), *reh'g denied*, 141 S. Ct. 2750 (2021) (finding the statute of limitations ended on May 27, 2000, when the conviction became final on May 26, 1999); *Carlyle v. Campbell*, No. 18-1631, 2018 WL 11301139, at *1 (6th Cir. Sept. 26, 2018) (finding the statute of limitations ended on August 23, 2012, when the conviction became final on August 22, 2011); *Kirchoff v. Warden, Chillicothe Corr. Inst.*, No. 16-4186, 2017 WL 4863119, at *2 (6th Cir. May 25, 2017) (finding the statute of limitations ended on November 5, 2012, when the conviction became final on November 4, 2011); *Williams v. Wilson*, 149 F. App'x 342, 345 (6th Cir. 2005) (finding the statute of limitations ended on February 11, 2002, when the conviction became final on February 10, 2001).

Not only do various cases contradict each other, but we also calculated timeliness in two different ways in *Bronaugh* itself. There, the direct appeal's date of finality was September 9, 1996. 235 F.3d at 284. Properly applying the rule we had announced earlier in the opinion, we began counting the day after finality as day 1, such that "[a] total of 209 days passed from September 10, 1996 to April 7, 1997," at which point Bronaugh filed an application to reopen his direct appeal and tolled the statute of limitations. *Id.* at 286. The state supreme court dismissed the appeal on January 28, 1998, and so "[o]n January 29, 1998, the one-year period of limitations began to run again." *Id.* Bronaugh filed his federal habeas petition on June 30, 1998. *Id.* We stated that "a total of 153 days passed," and then combining the 209 days and 153 days, found that only 362 days had passed and the petition was timely. *Id.* at 286–87. We did not, however, calculate the 153 days the same way we did the 209 days. Following the opinion's earlier pronouncement, we would begin counting the day after finality, which would be January 29— but 153 days from January 29 is actually July 1, not June 30 as we found.

In the cases cited in this discussion, the one-day difference between the two approaches was not dispositive because there was more than a one-day difference between the expiration of

the statute of limitations and the filing of the habeas petition. *See, e.g.*, *id.* at 286 (calculating that the petition was filed three days prior to the expiration of the statute of limitations, even with the miscalculation); *Liggins*, 2020 WL 3866872, at *1 (petition filed 21 years after the date of finality); *Kirchoff*, 2017 WL 4863119, at *2 (petition filed roughly five months late). So this court has not faced a case where there is a one-day margin of error in calculating the statute of limitations the way there is in the case before us now.

To further complicate the landscape, we have inconsistently applied the calculation in cases where the statute of limitations inquiry falls on a leap year. *See Fortson v. Carter*, 79 F. App'x 121, 123 (6th Cir. 2003) ("Fortson arguably had one additional day . . . in which to file his petition because 2000 was a leap year."); *see also Brown v. Brewer*, No. 2:15-cv-10638, 2016 WL 28988, at *3 (E.D. Mich. Jan 4, 2016) (providing that the limitations period had 366 days rather than 365 days because of the leap year); *Leon v. Parris*, No. 3:15-cv-0094, 2015 WL 4394327, at *2 n.2 (M.D. Tenn. July 16, 2015) (same).

Miniard argues that neither the inconsistent application of the anniversary method nor the leap-year ambiguity presents an extraordinary circumstance warranting the application of equitable tolling. What this untimeliness comes down to, Miniard claims, is attorney error in miscalculating the deadline, and equitable tolling is not a proper remedy for "a garden variety claim of excusable neglect such as simple miscalculation that leads a lawyer to miss a filing deadline[.]" *Holland*, 560 U.S. at 651–52 (cleaned up).

But our confused caselaw is an extraordinary circumstance, and Moss's counsel's reliance on the unclear landscape resulted in only a one-day delay. Moss therefore satisfies both factors and I would hold that equitable tolling applies to excuse Moss's untimely petition.

Having cleared the first of Moss's two procedural hurdles in the case, I move on to procedural default.

## B. Procedural Default

Procedural default is a "critical failure" that occurs when the petitioner "fail[s] to comply with state procedural law." *Gibbs v. Huss*, 12 F.4th 544, 550 (6th Cir. 2021) (quoting *Trest v. Cain*, 522 U.S. 87, 89 (1997)). It occurs when:

> (1) the petitioner failed to comply with a state procedural rule that is applicable to the petitioner's claim; (2) the state courts actually enforced the procedural rule in the petitioner's case; and (3) the procedural forfeiture is an 'adequate and independent' state ground foreclosing review of a federal constitutional claim.

*Willis v. Smith*, 351 F.3d 741, 744 (6th Cir. 2003) (quoting *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986)).

Michigan Court Rule 6.508(D)(3) requires a petitioner to raise an IATC claim on direct appeal. Both parties agree that Moss procedurally defaulted his IATC claims because he raised an IATC claim under *Strickland* and not under *Cronic*. *See Amos v. Renico*, 683 F.3d 720, 733 (6th Cir. 2012) (holding that Michigan Court Rule 6.508(D)(3) "is an independent and adequate state ground sufficient for procedural default that required [petitioner] to raise these claims [of IATC] during his direct appeal").

But we can review a procedurally defaulted claim if "the [petitioner] can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law[.]" *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *see also Sutton v. Carpenter*, 745 F.3d 787, 789–90 (6th Cir. 2014). The ineffective assistance of appellate counsel in failing to raise the defaulted issue is a recognized "cause" that can excuse procedural default.[1] *Edwards v. Carpenter*, 529 U.S. 446, 451–52 (2000).[2] Therefore, if Moss can show that he received ineffective assistance of appellate counsel because his appellate counsel, Kostovski, failed to raise the IATC *Cronic* claims, then Moss's procedural default is excused. *Seymour v. Walker*,

---

[1]"A separate finding of actual prejudice beyond *Strickland* prejudice is not required." *Avery v. Wainwright*, No. 20-3530, 2022 WL 1498431, at *12 (6th Cir. May 12, 2022) (first citing *Joseph*, 469 F.3d at 432–63; then citing *Hall v. Vasbinder*, 563 F.3d 222, 237 (6th Cir. 2009); and then citing *Ege v. Yukins*, 485 F.3d 364, 379 (6th Cir. 2007)).

[2]Moss could not have procedurally defaulted his ineffective assistance of appellate counsel claim because it could not have been raised on direct appeal, as state post-conviction review was the first opportunity to review appellate counsel's performance. *See Guilmette v. Howes*, 624 F.3d 286, 291 (6th Cir. 2010).

224 F.3d 542, 550 (6th Cir. 2000). We review the district court's decision to excuse Moss's procedural default de novo. *See Hall v. Vasbinder*, 563 F.3d 222, 236 (6th Cir. 2009); *McFarland v. Yukins*, 356 F.3d 688, 699 (6th Cir. 2004).

As a threshold matter, the Sixth Amendment right to counsel guarantees Moss the effective assistance of counsel on his first appeal as of right. *Evitts v. Lucey*, 469 U.S. 387, 396–97 (1985). Ineffective assistance of appellate counsel is reviewed under the familiar *Strickland* standard: whether appellate counsel (1) performed deficiently such that (2) "there is a reasonable probability that, but for counsel's" deficient performance, "the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 687, 694 (1984); *see also Whiting v. Burt*, 395 F.3d 602, 617 (6th Cir. 2005) (applying the *Strickland* standard to a claim of ineffective assistance of appellate counsel).

Finally, while typically AEDPA only authorizes habeas relief where "the state court's decision was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," 28 U.S.C.§ 2254(d)(1), a lower standard applies to analyzing an ineffective assistance of appellate counsel claim for purposes of establishing cause to excuse a procedural default, *Joseph v. Coyle*, 469 F.3d 441, 459 (6th Cir. 2006). Rather than meeting the AEDPA standard, or reviewing whether the state court's decision regarding the procedural default was reasonable, we instead—solely for the purposes of establishing "cause" under *Coleman*—determine whether there was an independent Sixth Amendment violation under *Strickland*. *See id.* That means that our "level of scrutiny of the ineffective assistance of counsel claim is the same as would be applied in direct review," rather than under AEDPA deference. (Reconsideration Op. and Order, R. 33, PageID 1835 (citing *Joseph*, 469 F.3d at 459).)

Appellate counsel performs deficiently when they fail "to find arguable issues to appeal—that is, that counsel unreasonably failed to discover nonfrivolous issues and to file a merits brief raising them." *Smith v. Robbins*, 528 U.S. 259, 285 (2000). This occurs when the issue appellate counsel fails to raise is "clearly stronger than issues that counsel did present." *Caver v. Straub*, 349 F.3d 340, 348 (6th Cir. 2003) (quoting *Smith*, 528 U.S. at 289); *see also Monzo v. Edwards*, 281 F.3d 568, 579 (6th Cir. 2002).

Prejudice results when there is a reasonable probability that if the unraised claim had been properly raised, petitioner would have succeeded in court. *See Howard v. Bouchard*, 405 F.3d 459, 485 (6th Cir. 2005). "[A] reasonable probability is a probability sufficient to undermine confidence in the outcome" of the case; petitioner "need not show that counsel's deficient conduct more likely than not altered the outcome in the case." *Joseph*, 469 F.3d at 459–60 (quotation marks and citations omitted). When appellate counsel fails to raise a claim that is a "dead-bang winner" and would have changed the result of the appeal, they have provided ineffective assistance of counsel. *See Meade v. Lavigne*, 265 F. Supp. 2d 849, 870 (E.D. Mich. 2003), *aff'd*, 104 F. App'x 461 (6th Cir. 2004).

I would excuse Moss's procedural default because the unraised *Cronic* claims were "clearly stronger" than the *Strickland* claims that Kostovski raised on appeal. "While both *Cronic* and *Strickland* concern Sixth Amendment violations, they are distinct legal claims and the difference between the two 'is not of degree but of kind.'" *Fusi v. O'Brien*, 621 F.3d 1, 6 (1st Cir. 2010) (citation omitted). *Strickland* carries the traditional two-pronged analysis of deficient performance and prejudice, and it applies to specific alleged errors committed throughout counsel's representation. *Strickland*, 466 U.S. at 687, 694. *Cronic*, on the other hand, examines the actual or constructive absence of counsel "at a critical stage" of one's criminal proceeding.[3] *Cronic*, 466 U.S. at 659; *see also Van v. Jones*, 475 F.3d 292, 311–312 (6th Cir. 2007). Rather than examining specific points of allegedly ineffective representation, under *Cronic* we must consider "counsel's overall representation of" the client during the critical stage, "as opposed to any specific error or omission counsel may have made." *Cronic*, 466 U.S. at 657 n.20. Unlike in *Strickland*, courts do not conduct a prejudice analysis when evaluating *Cronic* claims, because *Cronic* involves "circumstances 'so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified.'" *Bell v. Cone*, 535 U.S. 685, 695, 697 (2002) (quoting *Cronic*, 466 U.S. at 658–69).

There are three circumstances in which an IATC claim is analyzed under *Cronic* instead of *Strickland*: (1) where there is "the complete denial of counsel;" (2) where defense counsel

---

[3]Both the pre-trial and trial phases are deemed critical stages to which *Cronic* applies. *See Cronic*, 466 U.S. at 659 (trial phase); *Mitchell v. Mason*, 325 F.3d 732, 741–42 (6th Cir. 2003) (pre-trial phase).

"entirely fails to subject the prosecution's case to meaningful adversarial testing;" and (3) where "the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate[.]" *Cronic*, 466 U.S. at 659–60.

Here, the unraised *Cronic* claims were "clearly stronger" than the *Strickland* claims. As the district court correctly explained, both IATC claims were "clearly dead-bang winners," because Steingold's "errors were obvious from the record and leaped out upon even a casual reading of the transcript." (Reconsideration Op. and Order, R. 33, PageID 1836 (citing *Matire v. Wainwright*, 811 F.2d 1430, 1438 (11th Cir. 1987)).) But rather than illustrate how Steingold constructively abandoned Moss during both critical stages, Kostovski "neglected the central issue in [Moss's] case" by identifying two specific instances of ineffectiveness—waiving Moss's right to a jury trial and stipulating to the admission of the evidence from the entrapment hearing at the bench trial. *See Joseph*, 469 F.3d at 460 (quoting *Smith v. Dretke*, 417 F.3d 438, 442–43 (5th Cir. 2005)). These claims sound in *Strickland* instead of *Cronic* and fail to account for the various other clear defects in Steingold's representation.

As I discuss below, I agree with the district court that Moss's ineffective assistance of appellate counsel claim is meritorious and excuses the procedural default. Kostovski performed deficiently in failing to raise a *Cronic* claim "considering the facts she was clearly aware of when she reviewed the trial court record." (Reconsideration Op. and Order, R. 33, PageID 1837.) Since the *Cronic* claims are "clearly stronger" than the *Strickland* "issues that counsel did present," this deficiency was prejudicial. *Caver*, 349 F.3d at 348 (6th Cir. 2003) (quoting *Smith*, 528 U.S. at 289).

Having cleared the second, and last, procedural hurdle in the case, I now proceed to the merits of the underlying claim, which prove that Moss's *Cronic* claims were meritorious even under AEDPA's heightened deference.

**C. Merits**

*1. Standard of Review*

We review a district court's decision regarding a writ of habeas corpus de novo. *Foust v. Houk*, 655 F.3d 524, 533 (6th Cir. 2011). We also review the district court's determination that counsel was constitutionally ineffective de novo. *Burton v. Renico*, 391 F.3d 764, 770 (6th Cir. 2004). But under AEDPA, an additional deferential standard applies "with respect to any claim that was adjudicated on the merits in State court proceedings[.]" 28 U.S.C. § 2254(d). When there is an adjudication on the merits, we can only grant habeas relief if the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.*; *see also Chase v. MaCauley*, 971 F.3d 582, 590 (6th Cir. 2020). Our question on habeas review "is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).

To determine whether the court adjudicated the issues on the merits, we review the decision from "the last state court to issue a reasoned opinion on the issue[.]" *Hoffner v. Bradshaw*, 622 F.3d 487, 505 (6th Cir. 2010) (quoting *Payne v. Bell*, 418 F.3d 644, 660 (6th Cir. 2005)). Here, the last state court to issue a reasoned opinion was the Oakland County Circuit Court opinion denying the motion for relief from judgment after the *Ginther* hearing, because both the Michigan Court of Appeals and Michigan Supreme Court denied Moss's motion for leave to appeal the decision in unexplained one-sentence orders. These one-sentence, unexplained orders cannot be considered reasoned decisions because, put simply, they contain no reasoning. *See Ylst v. Nunnemaker*, 501 U.S. 797, 804 ("The essence of unexplained orders is that they say nothing."). But the reasoned opinion from the trial court adjudicated the claims on the merits. Though it ultimately applied *Strickland* to the two IATC claims, it discussed the differences between *Cronic* and *Strickland* and concluded that "the record in this case does not reflect a 'complete' failure of counsel." (Op. and Order, R. 5-11, PageID 914.) This is a

decision on the merits, so the state court's decision is entitled to AEDPA deference unless its decision is contrary to clearly established federal law. *See* 28 U.S.C. § 2254(d).

A state court decision is contrary to clearly established law if "the state court applies a rule that contradicts the governing law set forth" in Supreme Court caselaw or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [the Court's] precedent." *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000). And while "courts of appeals' decisions do not establish new rules, the court may look to such decisions to inform its analysis of whether a legal principle had been clearly established by the Supreme Court." *Avery v. Prelesnik*, 548 F.3d 434, 436–37 (6th Cir. 2008).

### 2. Pre-Trial IATC Claim

As the Supreme Court has unequivocally stated, the pre-trial period is "perhaps the most critical period of the proceedings . . . when consultation, thorough-going investigation and preparation [are] vitally important" to aid defendants. *Powell v. Alabama*, 287 U.S. 45, 57 (1932). "The pre-trial period constitutes a 'critical period' because it encompasses counsel's constitutionally imposed duty to investigate the case," and without meaningful "pre-trial consultation with the defendant, trial counsel cannot fulfill his or her duty to investigate." *Mitchell v. Mason*, 325 F.3d 732, 743 (6th Cir. 2003) (citing *Strickland*, 466 U.S. at 691). So when counsel does not investigate the case or does not consult with the client before trial, counsel "cease[s] functioning as counsel under the Sixth Amendment," and they are ineffective under *Cronic*. *Phillips v. White*, 851 F.3d 567, 579–80 (6th Cir. 2017).

Steingold constructively abandoned Moss during the pre-trial phase and so provided ineffective assistance of counsel under *Cronic*. Steingold entirely failed to meet his "constitutionally imposed duty to investigate the case." *Mitchell*, 325 F.3d at 743. He did not meet with Moss until the day of the entrapment hearing despite Moss's numerous attempts to schedule a meeting. When they finally did meet, it was only for a brief period immediately before the entrapment hearing.

Steingold did not conduct any investigation prior to the day of the hearing, did not speak to Moss's previous attorneys, did not attempt to find previously known witnesses, and did not subpoena the one witness he was aware of. It is no wonder that Steingold still had "a number of questions that remain unanswered" when the hearing began. (Evidentiary Hr'g Tr., R. 5-2, PageID 104.) The fact that Steingold only learned of three witnesses during the government's cross-examination of Moss—witnesses that Moss and Moss's previous attorney knew about and would thus be easily uncovered during the pre-hearing investigation—shows precisely what Steingold did to represent Moss prior to the day of the entrapment hearing: virtually nothing. Indeed, Steingold himself admitted to the court that he did not conduct appropriate investigation for the entrapment hearing.

On top of Steingold's failure to advance Moss's defense before the entrapment hearing, he continued to do nothing—no investigation, no additional meetings with Moss—before the trial, a trial that he requested a continuance for because he was unprepared and needed additional time.

All Steingold did in preparation for Moss's case was meet with Moss once before the entrapment hearing. But even the length of this meeting is disputed. While Steingold claims he spent two hours with Moss, Moss indicates that they spent only about 30 minutes together. Regardless of the length, during this meeting Steingold gave Moss 40 to 50 pages with questions for the entrapment hearing, and rather than appropriately prepare Moss to testify for what Steingold believed was Moss's best defense, Steingold simply told Moss that he needed to answer the questions properly while on the stand.

Steingold therefore constructively abandoned Moss during the pre-trial phase. The state court erred when, rather than applying *Cronic* to Steingold's wholesale denial of effective counsel, it instead applied *Strickland*, examining only Steingold's decision not to interview witnesses before trial. In failing to apply the correct standard of this clearly established Supreme Court precedent, the state court opinion is contrary to, or an unreasonable application of, clearly established law. *See Strickland*, 466 U.S. at 691 (stating that "[c]ounsel has a duty to make reasonable investigations"); *Mitchell*, 325 F.3d at 744 ("Because the Supreme Court has repeatedly made clear that there is a duty incumbent on trial counsel to conduct pre-trial

investigation, it necessarily follows that trial counsel cannot discharge this duty if he or she fails to consult with his or her client.").

Both Miniard and the majority rely on *Maslonka v. Hoffner*, 900 F.3d 269, 279 (6th Cir. 2018), to argue that *Cronic* cannot apply to either of Moss's IATC claims. But *Cronic* does not require that counsel be "physically absent throughout an entire phase of the litigation or that a state actor prevented Moss's counsel from adequately representing him." (Maj. Op. 12.) "The deprivation can be literal, as when counsel fails to appear, or it can be constructive, as when counsel's performance is so defective that he may as well have been absent." *Phillips*, 851 F.3d at 580. While physically present during the pre-trial phase, Steingold's performance was so defective that he may as well have missed the entire proceeding.

The majority also argues that Moss's pre-trial claim is distinct from *Mitchell v. Mason*, 325 F.3d 732 (6th Cir. 2003), because the *Mitchell* court granted habeas relief on the defendant's *Cronic* claim where counsel only spoke with the defendant for six minutes before the trial and did not conduct any pre-trial investigation. But these are in fact nearly identical cases. Just as counsel did not conduct any pre-trial investigation in *Mitchell*, Steingold did not conduct any pre-trial investigation for Moss. Regardless of how long Steingold spoke with Moss, it was clearly not a substantive conversation, as Steingold did not uncover witness names that would have been known from a perfunctory investigation or conversation with Moss. Speaking once with the client, whether for 30 minutes or two hours, without doing more at any point prior to the entrapment hearing and trial, constitutes constructive abandonment of a client during the critical pre-trial phase.

I would therefore conclude that the state court's decision is contrary to, or involved an unreasonable application of, clearly established law, and I would grant Moss's habeas motion on the pre-trial IATC claim.

### 3. Trial IATC Claim

Moss also argues that the state court should have applied *Cronic* to his trial IATC claim. Where "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing,"

the client has been constructively denied counsel. *Moss v. Hofbauer,* 286 F.3d 851, 860 (6th Cir. 2002) (quoting *Cronic*, 466 U.S. at 659).

Here, Steingold constructively abandoned Moss when he "entirely fail[ed]" to subject the government's case to meaningful adversarial testing during trial. *Id.* The bench trial lasted only 20 minutes. During those 20 minutes, Steingold waived his opening statement, did not put any witnesses on the stand, did not cross-examine one of the government's witness or object during the government's direct examination, and waived his closing argument by saying "I have nothing, your Honor." (Bench Trial Tr., R. 5-6, PageID 694.) Steingold also stipulated to the main facts and elements of the offense, effectively conceding Moss's guilt.

It is true that Steingold did one thing at trial: he asked some questions of the government's second witness. A closer look at his examination of this witness, Hill, however, reveals that it was no examination at all because it did not subject the government's case to any meaningful adversarial testing. Hill was called as an expert to present evidence that the amount of cocaine at issue was inconsistent with personal use and instead indicated an intent to sell the drugs. But as Steingold insisted, the court did not need an expert to testify to these matters because Steingold had willingly stipulated to the amount of drugs Moss possessed and that the intent to sell that quantity of drugs was apparent. And Steingold only asked questions about Hill's qualifications as an expert. *Cronic* does not ask whether counsel took any action whatsoever. It asks whether counsel took action that "subject[s] the prosecution's case to *meaningful adversarial testing*." *Hofbauer*, 286 F.3d at 860 (emphasis added) (citing *Cronic*, 466 U.S. at 659). The few questions Steingold asked Hill during trial clearly did not test the government's case; it was a cross-examination in name only.

"We presume prejudice in this case because [Steingold's] performance amounted to nonperformance; he essentially ceded the [trial] to the [government.]" *Phillips*, 851 F.3d at 581. And Steingold's insistence that the court continue the trial date so that he could properly prepare for the trial makes what happened—or did not happen—at trial all the more incredulous.

Miniard argues, and the majority agrees, that "Steingold only acted in a limited capacity during trial because the trial court had already denied the motion to dismiss based on entrapment,

and Steingold strategically focused on its appeal to the Michigan appellate courts—Moss's only available recourse at that time." (Maj. Op. 13.) But there are several problems with this argument. For one, it ignores the fact that Steingold did not conduct any investigation prior to the entrapment hearing, and so he was not meaningfully focused on this defense in the first place. For another, he insisted that he was not prepared for trial, and so the judge granted him a 16-day continuance. Telling the court that he "frankly was not prepared to go to trial today" was directly against his interest if he was strategically focused on appealing the court's denial of the motion to dismiss as quickly as possible. (Mot. to Dismiss Tr., R. 5-5, PageID 657.)

"[T]he point is this: Constitutionally effective counsel must develop trial strategy in the true sense—not what bears a false label of 'strategy[.]'" *Ramonez v. Berghuis*, 490 F.3d 482, 489 (6th Cir. 2007). And calling Steingold's approach a strategy or "'a tactical decision' . . . is nonsensical because 'counsel did not even take the first step of interviewing witnesses or requesting records.'" *Foust*, 655 F.3d at 536 (first citation omitted) (quoting *Porter v. McCollum*, 558 U.S. 30, 39 (2009)); *accord Florida v. Nixon*, 543 U.S. 175, 182–84, 191–92 (2004) (holding that counsel provided effective assistance when he conceded the defendant's guilt during a capital murder trial while maintaining the right to cross-examine the prosecution's witnesses, because this was acceptable strategy to focus his preparation on finding and presenting mitigating evidence during the penalty phase in an attempt to ward off the death penalty). Steingold's choices therefore fell "outside the wide range of professionally competent assistance." *Martin v. Rose,* 744 F.2d 1245, 1249 (6th Cir. 1984) (quoting *Strickland*, 466 U.S. at 690). Ultimately, Steingold's "total lack of participation deprived [Moss] of effective assistance of counsel at trial as thoroughly as if he had been absent. This was constitutional error even without any showing of prejudice." *Id.* at 1250–51.

Moss "is entitled to habeas relief because the state court unreasonably applied the *Strickland* standard where Petitioner clearly was constructively denied the assistance of trial counsel." (Reconsideration Op. and Order, R. 33, PageID 1845.) I agree with the district court that the state court opinion was contrary to, or involved an unreasonable application of, clearly established federal law. The state court should have applied *Cronic* to both of Moss's IATC

claims rather than *Strickland*, and both *Cronic* claims are meritorious.  Indeed, I would be hard pressed to find a worse dereliction of duty than that of Steingold's representation of Moss.

## III.  CONCLUSION

Because I would affirm the district court's decision and grant Moss's habeas petition, I respectfully dissent.